161059 Smartflash v. Apple. Mr. Perry, whenever you're ready. Thank you, Chief Judge Prost, and may it please the Court. These business method patents are in the heartland of Alice. This is not a close case. The asserted claims recite a fundamental economic concept, conditioning access to content based on payment, that can be implemented on any generic computing device. But isn't the problem rooted in computer technology, and therefore doesn't it fall within, we'll hope some have broadly construed some of the language in DDR? Your Honor, it does not either fall within, or excuse me, it's not rooted in computer technology, nor does it fall within DDR, and let me answer that in three steps, if I may. First, the business problem addressed here, data piracy, is not a technological problem. It existed before the Internet, and it exists outside the Internet today. Second, the solution offered here, or the proposal offered in these patents, is not limited to the Internet. In fact, the patent says so in so many words that it can be applicable to any number of things, including, for example, CDs. Digital data is on CDs. CDs can be copied, and this patent cites in the specification copying from CDs. And third, I think, and most importantly, the point of DDR, we take it, is that a claim that overrides the ordinary, routine, conventional operation of a network, as in DDR itself, as in Amdocs, as in BASCOM, that takes the network and changes its functionality in a new and innovative way, may be eligible. Did we hear that the patent office has found these patents not to pass 101 muster? That's correct, Your Honor. The PTAB has now concluded CBM review of all of the patents. These four tried claims in this case have all been declared ineligible, as well as every other claim in the entire patent portfolio. The four tried claims, which are at issue in this appeal, the rehearing petitions have been denied, the appeals have been filed, that appeal is pending in this court. Now, of course, what was just decided in the patent office can be appealed. Now, what's the situation if we don't agree with you on the ineligibility of these claims? We have a jury decision that the claims stand. Of course, there are other issues as well. But what's the status of such a would-be decision here where we uphold the eligibility of the claims and the patent office has knocked them out? Your Honor, first, there are further proceedings remaining in this case. The court has ordered a retrial on damages that has not yet occurred. It's been stayed pending this appeal. Second, if the court were to rule on eligibility, that these affirm the judgment of eligibility, the court would then have to reach our other challenges. We think these claims are either invalid or not infringed under the means plus function analysis that needs to be applied after Williamson. We think there is claim construction problems. And, of course, in that retrial, if we got all the way down that road and jumped through all those other hoops, there was a serious instructional error here that would require a retrial on obviousness. As to the intersection between the PTAB and the district court decision, if that's the court's question, the PTAB appeals are here in this court as to the tried claims. The rest of them will be here soon. One option would be for the court to coordinate them, which we've proposed before and we continue to think makes sense for judicial economy reasons. The court, of course, can reach them first in this case. We submit that they should be declared ineligible. There's no way that these patents survive. They are bad patents. The PTAB got it exactly right. We do think— Has the briefing been completed in those cases? I'm sorry? Is the briefing complete on the ones that have already been filed? No, Your Honor. Every time a briefing deadline arrives, SmartFlash files another motion to slow the train down to catch up with the caboose. Is there an argument made in that case? This is neither here nor there for this case, but is there a question about whether or not it was an appropriate CBM proceeding? Your Honor, the institution decision found, of course, that these are business method patents, that they're directed to financial services, and that they do not provide a technological solution. I don't know whether SmartFlash intends to challenge that under the court's recent unwired plan of ruling. As applies to this appeal, we would submit that that is a ruling by a coordinate branch of the federal government that SmartFlash has not challenged here and that the absence of a technological solution as found by the PTAB certainly plays into the DDR analysis because DDR essentially adopts a technological solutions requirement for one prong of the eligibility. Let me move you back to this case. Yes, Your Honor. And the step two analysis the district court went through. I mean, he relied, as I read it, I mean, he just said this is a complicated and a very detailed process that we go through, and he said, therefore, it satisfies the inventive concept prong. So what was wrong with his analysis in that regard? Your Honor, the only specific claim limitations, and remember it's the limitations in the claim and not the specification that have to define the inventive concept, the district court, magistrate judge actually, identified two. Some of the claims then at issue in the case required distinct memory limitations, content memory and parameter memory, either physically or logically separated in the device. The court identified that as one so-called inventive concept, and the other was the application of use rules. That is a decision point as to whether or not access could be provided. The distinct memory claims dropped out of the case. SmartFlash abandoned them before trial. So one of the two things the district court relied on isn't even here anymore. And then at trial, Mr. Rax, the inventor, testified, as he had to, that he did not invent use rules. He did not invent access rules. He did not invent digital rights management. He did not invent any of the kinds of things that apply to access to content, which should not surprise. I mean, this is really— But even if individually these various steps were in the prior art, a particular combination could still result in an inventive concept, right? That is absolutely true theoretically and absolutely inapplicable to these patents because here we have no combination that is not itself routine. In other words, SmartFlash continues to rely on storage, transmission, reading and writing. These are the things that computers do. And if I can analogize the case to its closest counterpart, it's really Ultramershal. Ultramershal was the use of advertising as currency to get access to content. This case is the use of currency as currency to get access to content. I mean, it's closer to the business method than Ultramershal. And what Ultramershal said, and it's a very important passage we believe, that while the claim limitations there added a degree of particularity, what my friends at SmartFlash call the specificness, that the particularity is not the test for inventive concept. Rather, it is whether there's an addition. As to the specific combinations, Your Honor, SmartFlash identifies only three in its brief. And this is at pages 28 and 30 of the red brief. First, they say storing payment on the data carrier. The PTAB directly addressed this. This was not an argument, by the way, they made in the district court. So the PTAB directly addressed this. Mr. Perry, let me ask you. These claims are a clever process. We get a lot of them. And they get knocked down under 101. How does one protect these clever software ideas operated on a computer? Your Honor, claims like these properly get knocked down under 101 because these are pre-Bilski patents. These were prosecuted under the old guidelines that the PTO has disavowed in light of the Supreme Court's teaching. They were killed by Bilski. They were buried by Alice. The nails in the coffin were put in by the PTAB. There's nothing left of these patents. How, to answer your question, does a true innovator, a true inventor, claim computer-implemented methods? By following the guidance laid down by the Supreme Court, by this court in Alice, and by the post-Alice decisions. Do you think that guidance is clear? Your Honor, it is clearer than it was before, and it is becoming clearer through the decisional process. And certainly the court has marked out something more in the context of computer-implemented methods, Your Honor. It is clear from DDR and its companions that an improvement in the functionality of the computer itself, which, of course, Justice Thomas said in the Alice Step 2 analysis as well, can then pass that threshold and move on to the patentability analysis under the rest of the Patent Act. Here we don't have that. Here we have, as in Ultramershal, as in the Affinity Labs cases, as in TLI, an old-fashioned, pre-Bilski, results-oriented, functional claim, which simply describes the outcome that the applicant wished to reach without any invention as to how to get there. Could a computer-implemented method of delivering secure content be patented? Of course. New encryption methods, for example, are always offered as good examples of implementation of content delivery methods. But this court has a series of cases, an unbroken line of cases after Alice, in which the manipulation, transmission, delivery, and storage of information, content, on devices, conventional computers and mobile devices, are not eligible. And that's because they were prosecuted under that old State Street, just-claim-the-result-is-enough analysis. Is it because they're mostly mental steps? Excuse me. There is certainly a mental steps component here as related to what would a human being do in the non-Internet world. There is no difference in concept between the application here or the description here and the clerk at the Blockbuster, if you walk in and pay $4.99 to rent a DVD for a night or pay $19.99 to buy it outright. That is what this patent claims if you, quote, do it on a computer. And what Alice told us, what the Supreme Court told us in Alice, was that's not enough. That translation of a bricks-and-mortar, human-being, mental step into the computer world cannot confer eligibility. And that's all we have here. Judge Newman, I'm sorry. Well, then, perhaps you've answered the question, but one can't help but wonder why we are talking about 112 instead of 101. Well, Your Honor, I think here we have a 101 problem and the court need not get to 112. There is a relation between the two doctrines, and this case is an excellent illustration of it. This kind of functional claiming where the patentee, where the applicant claims only the result and not the process by which that result is obtained by a person of skill in the art, if it passes 101, and we submit, of course, it should not, but if it does, it raises a serious indefinite problem. And let me explain that very quickly. The inventive concept claimed by SmartFlash, and this is from the red brief at page 19, is, quote, the asserted claims are drawn to specific electronic devices programmed to carry out specific purchase, download, access, and storage functions. Those functions, Your Honor, are not defined by structure anywhere in this patent. The claims themselves are purely functional. And then when one goes to the specification, one finds not structure, not algorithms, not flow charts, not diagrams, not any disclosure as to how to program this mythical device, but rather repeated references to means, the content delivery means, the content storage means. In other words, we have functional claims with a functional specification. And so we have in these patents the problem identified by Professor Lemley in his article, and Judge Lurie, this is one of the answers to your questions about software patents, of pure functional claiming. Can there be a software patent? This court has left that question largely open, but certainly it has said in the line of cases involving Aristocrat and NOAA and so forth that if there is to be a software patent, it must disclose to persons of skill in the art the steps necessary to achieve the result, not just the result itself. These patents, in contrast, claim only the result, only the desired outcome of conditioning access to content based on payment. That renders them ineligible under 101, full stop. If the court accepted SmartFlash's position, it would render them indefinite under 112, full stop. They cannot survive either of the two analyses because they are, at bottom, problematic applications and patents. Unless the court has further questions, I'll reserve.  Mr. Patent. Chief Judge Prost, and may it please the court. The argument that you have heard from Apple ignores the language of the claims and what those limitations describe. The patents that are at issue here are eligible because they claim a specific solution to a technological problem associated with online distribution of digital content files. This was a problem that major corporations, IBM, Xerox, Sun, those corporations were trying to solve this problem and patents were introduced at trial that Apple attempted to use to invalidate these patents as either obvious or in the case of the 720 patents. Is that a step one or a step two analysis? I think it very much goes to the step two analysis as this court pointed out in Internet Patents, which is to say that this is a technological problem associated with delivery of digital content files. Is the computer modified in a physical way to solve this problem or is it just more, and I don't mean to demean it by saying just more, but is it just mental steps written down in getting the computer programmed? Not at all. I think that this falls very much within the distribution of functionality within the network and among devices in a system. And it's done in an innovative way that has distinct advantages over alternatives. And I'm going to point to three of those limitations that are critical referring to the 720 patent. First, the claims require a data carrier that stores both content data and payment data that's used for payment. That's not something that Apple was able to show in the prior art. And it obviously provides convenience for the user. Second, the claims require a payment validation system that returns payment validation data. It's the payment validation data that is then used to retrieve the protected content from a data supplier. That's an architecture that is innovative. It requires a particular distribution of functionality within the network that is different from the alternative. And I'll mention the third, which is that when the content data is retrieved from the data supplier, there's also access rules that are downloaded to that same data carrier, that same place where the content data is stored. And there are distinct advantages to having those access rules stored next to content. It means you can download one content once and then either modify the access rules. So what's inventive about that? How does that fulfill the requirement of an inventive concept? It fulfills the requirement of an inventive concept because it was that particular arrangement of functionalities within the network. So, for example, the alternative of ultramercial was suggested, where there's a situation where the abstract idea is simply exchanging, viewing an advertisement for receiving content. Now, if this patent simply said, make payment in exchange for protected content, or it said a user will transmit payment and in exchange receive content, then that would certainly be very much like what was at issue in ultramercial. Wasn't ultramercial a lot more sophisticated and a lot more complicated than that? I recall the case that had like 11 steps, and it was talking about what to do on an Internet website, which makes it much closer to DDR than the case here is described. I don't think so, Your Honor. First of all, there's no doubt that this is specifically, these claims are about a technique that works within a computer network. The idea that this is about CDs is just not correct. These claims specifically refer to the use of a data carrier that transmits to a payment validation system. So I do want to correct that. But with regard to ultramercial, what was critical in ultramercial is that the court made clear that most of the majority of the steps simply described broke down the process of exchanging payment, or exchanging watching an ad for the content. And that was simply broken down into a number of steps. But these claims describe passing information back and forth. Of course they do, Your Honor, but they do so in a specific architecture and involving specific storage. That just means that they're very clever. No, they are inventive, Your Honor. And I think that clever is one way to say inventive. The point is that they are not simply employing the Internet with a conventional business practice, but there is a problem that arose with the distribution of digital content that was unconnected to a medium. You have digital content that you can sell over the Internet. And that created tremendous problems of piracy, unlike anything that had been seen. And it created a tremendous opportunity. If somebody could come up with an architecture and a method for storage on particular devices that would address those technological problems of security and of inconvenience of entering, for example, your payment information into an invoice every time you wanted to get it. Does inventive step essentially mean non-obviousness? In Europe, if I recall from years ago, it probably still was the same. Their statute involves an inventive step. And by that, that's their replacement for 103, non-obviousness. Is inventive step here non-obviousness? Well, I think doctrinally this court has said that it's not the same as non-obviousness, although the court has also said that there's an analogy to it. And what is in this case, I think that the fact that there was a trial over whether these patents were obvious and Apple lost and doesn't challenge the result of that except with regard to the jury instruction. Even if a bunch of steps are non-obviousness, non-obvious, they are still mental steps, are they not? But again, Your Honor, these are not simply mental steps because of the nature of the way in which the functionalities at issue are distributed and this particular requirement. Wait a minute. I'm getting a little confused here. I mean, I don't think we've ever had a case maybe because the circumstances have never arisen. But what you're suggesting is if the court decides not to do 101 first, which it typically does, and you ultimately have a conclusion of non-obviousness by a jury, that that somehow informs or determines whether or not you've got an inventive concept here? I didn't mean to – as I say, I don't mean to suggest doctrinally that the court can say, well, the jury found that it was non-obvious, so our job is done. That's not my point. But my point is that what this court has emphasized is the difference between a patent that simply claims a result. This is, for example, something that simply claims a result, and a patent that teaches how to do something that couldn't be done before. It's not – and so there's two different things. Yeah, but it depends on how. We've got so many cases now, contract extraction, TLA. I mean, a lot of cases that talk about organizing, retrieving, receiving, and all of those steps. I mean, the district court here, when he was describing why he concluded this was an inventive concept, says because it addresses specific ways of managing access to digital contact data based on payment through storage and retrieval of used data. Don't a lot of our cases suggest that that's not sufficient, that those kinds of exercises are not sufficient for step two? I think the district court got this one right under this court's decisions in DDR, and Bascom confirms that, as does Amdocs. And I do want to urge the court to see how this improves the functionality of the computer and the computer system itself. You have a situation in which there are digital files, so we're not talking about information that existed in the pre-internet world. There wasn't a prior situation where you had simply delivery of a digital file free of media. And so that created issues that artisans were trying to solve so that it would be convenient and secure to make content available over the internet to purchasers. And what this invention does is it says, okay, there's a series of issues related to that that we can solve by combining these functionalities on a single data carrier that is then portable. Again, it is a quite specific solution. If you think about the preemption policy concern that's behind this, this is not a preemptive invention. It is saying not use the internet to deliver content in exchange for payment. What it is saying is there's a number of problems with simply sending payment to a website and then receiving content in return. That is not working well. So how do we solve that problem? Well, one of the ways in which we solve the problem is to say people don't want to have to enter information into a website, and it also means that people without access to a credit card won't be able to use the data. So we can solve that problem by putting payment data on the data carrier. We have a problem in that if you expose your payment information to the data carrier, there's a loss of security there. So instead, what we do is we have a scheme owner, and the scheme owner will be the one to validate the payment data. The scheme owner doesn't want to have to deal with all of the content, so what the scheme owner does is returns payment validation data, which is then used to go retrieve the content from the data supplier. Again, these are not inherent in the idea of delivering content in exchange for payment. Very much to the contrary, they are a specific solution that is designed to overcome the problems that were associated with distribution of digital content in exchange for payment. Before your time runs out, you want to turn briefly to the indefiniteness argument. Certainly, Your Honor. This Court has been very clear that the requirement for an algorithm, for example, only applies in a circumstance where the inventor employs means plus function claiming. This Court has never suggested, and it has dealt with dozens of patents involving computers and processors, it has never suggested that a processor is non-structural. Here, we have a processor running code to do something. That is a structural claim that is governed by Section 112, Paragraph 1 and 2 AB. It is not in means plus function format. That doesn't mean there's any sort of a free pass, but Apple is standing in front of you today and saying, well, this is indefinite. They didn't argue that it was indefinite except by way of 112.6. They never said that the claim terms by themselves were indefinite under A and B, but they said you have to treat this as means plus function claims, and because they're means plus function claims, then you have to go look in the specification for structure. That's not the way the statute works. The statute only requires limiting the claim to corresponding structure in the specification if it's claimed in means plus function terms. These claims are not in that form. They are in the form of a processor running code to carry out certain functions. That's very common, and this court has never held that anything like this is a means plus function claim, and to the contrary, it has upheld the structural nature of circuits performing various functions. It's upheld the structural nature of something like a detent mechanism because it describes a class of structures, and as the district court pointed out, there was testimony by Apple's expert conceding that processors are a class of structures, and it's interesting to look at the testimony that that expert gave because what the expert says is I've been told that if something's a means plus function claim, then here's what you do. What he didn't say was as an expert, I don't know what a processor is. There's no definite structure associated with that, and the district court quite rightly said there's a presumption if you don't use a nonce word that this is ordinary structural claiming, and that's what occurred here. So I think, again, the district court quite rightly said this is not a means plus function claim, and they've waived any claim that if it's not means plus function, that there's any problem under A and B. If it would be helpful, I can return to the issue of the subject matter eligibility of the claim. But I do also, if the court has questions about the other issues. So what I do want to close with is, again, to emphasize that this court has made clear that there's a distinction between circumstances that just take a conventional business practice and put it onto the Internet, a case like Ultramershal, or cases that describe the results without describing the means to achieve them. I think that Internet patents cases versus active networks illustrates that problem. It's Internet specific. How do you keep the information on the web page when you navigate away? But it doesn't tell you anything other than you should achieve that. It doesn't tell you how to do it. This case falls into neither bucket. That is to say, it is talking about a specific technological problem associated with the distribution of a new form of content, i.e., content files that can be distributed without any medium over the Internet or over a computer network. And two, it says very specifically, here's how we are going to overcome the problems associated with the ways this has been done in the past, and here's the way that we can make this convenient and secure and to the benefit of users and content providers as well. Thank you. Thank you. Unless the court has questions on 112, I have just two quick points on 101. First, the inventive concept identified by SmartFlash. Mr. Panter says there are three, storing content on the data carrier. The PTAB said the concept of storing two different types of information in the same place and the same device is an age-old practice. That's in the final written decision on the 221 patent at 18, and it cited some examples of that. Second, validating payment in advance. The CyberSource case, which is pre-ALICE but presaged ALICE quite well, said confirming a credit card transaction in advance of doing something on the Internet is something that merchants do everywhere. That's not valid. And third, access rules. ALICE-involved rules, Accenture-involved rules, most recently this court in fair warning had a rules case, and the court said that where rules, quote, ask the same questions that humans in analogous situations have asked for decades, not centuries, that's at 839F31095, then those rules do not confer eligibility. And here the rules, of course, are not created by this applicant. They're not in this patent. The rules are created by the data supplier. The device simply applies any rules that come associated with the data, and those rules can be as simple, of course, as if you haven't paid for me, then you may not listen or watch to me, and that's exactly the same as this court considered an intromersial. As to the digital data point, digital data, of course, predated the Internet and exists outside the Internet, and the patent itself in column 8, page 171 of the appendix, explains that the data source may be a CD or a DVD or even come from a third party such as a cable TV company. This is simply content, and this court has had a series of cases, TLI, both Affinity Labs cases, intromersial and others, electric power, all of which have dealt with the manipulation of information. Content is information. None of which have found eligibility. There is nothing like this case on the eligibility side. These claims are ineligible under 101, and this court should reverse on that basis. Thank you. We thank both parties, and the case is submitted.